# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 14, 2008

Charles R. Fulbruge III
Clerk

No. 07-20270

———

DAVID CROWELL

Plaintiff - Appellant

v.

SHELL OIL CO., formerly known as or doing business as Pennzoil-Quaker State Company; SHELL OIL PRODUCTS LLC, formerly known as or doing business as Pennzoil-Quaker State Company, also known as Sopus Products; PENNZOIL-QUAKER STATE COMPANY; KELLEY LANG; PENNZOIL-QUAKER STATE COMPANY EMPLOYEES RETIREMENT PLAN,

Defendants - Appellees

———

PAUL B SIEGEL

Plaintiff - Appellant

v.

SHELL OIL COMPANY, formerly known as Pennzoil-Quaker State Company; SHELL OIL PRODUCTS LLC, also known as Sopus Products, formerly known as Pennzoil-Quaker State Company; PENNZOIL-QUAKER STATE COMPANY; KELLEY LANG; SHELL PENSION PLAN, formerly known as Pennzoil-Quaker State Company Employees Retirement Plan

Defendants - Appellees

No. 07-20270

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

Patrick E. Higginbotham, Circuit Judge:

Former employees of Pennzoil, David Crowell and Paul Siegel, were terminated when the company changed control. Under Letters of Agreement referring to their retirement and savings plan, they received a cash payment when the company merged with Shell. They filed separate suits, urging that Defendants underpaid them and that state law applied. The district courts found that the agreement was governed by ERISA and consolidated the cases, granting summary judgment to Defendants. Plaintiffs appealed.

I

David Crowell, formerly Pennzoil's Director of Internal Audit, and Paul Siegel, formerly Pennzoil's General Counsel, sued Shell and Pennzoil[1] in separate cases in Texas district court, alleging breach of contract, breach of warranty, and fraud under Texas law arising from a benefits dispute. They alleged that Defendants misconstrued amended language in their retirement plan – that when they cashed out stock options earlier in their career, the income earned was part of their "Considered Compensation" in Shell's amended Plan, entitling them to a higher lump-sum payment for early retirement when Pennzoil merged with Shell in October of 2002 and terminated them.

---

[1] Shell Oil Company acquired Pennzoil-Quaker State Company in a merger on October 1, 2002. Pennzoil became a wholly owned subsidiary of Shell.

Pennzoil's original retirement plan – the Pennzoil-Quaker State Company Salaried Employees Retirement Plan[2] ("retirement plan") – was effective as of January 1, 1999, and provided for pension benefits upon employees' retirement or early retirement. The Plan was a deferred compensation plan that paid employees a certain percentage of their monthly 1997 "Considered Compensation," multiplied by their number of years of service to the company and additional money also calculated by their 1997 "Considered Compensation," their years of service accrued during certain time periods, monthly Considered Compensation, and monthly compensation after December 31, 1997. The higher the "Considered Compensation," the higher the pension benefits to the employee. The retirement plan originally excluded "income arising from the exercise of a stock option" from the definition of Considered Compensation.

Pennzoil amended the definition of "Considered Compensation" in its retirement plan several times. The original plan provided for a monthly annuity calculated by a certain percentage of "monthly 1997 Considered Compensation" multiplied by the number of years of service, and it defined monthly 1997 Considered Compensation in the last paragraph of Section 9.1(I) as "the lesser of (I) 1997 Considered Compensation or (ii) if the Member terminates service prior to January 1, 2003, the Member's average monthly Considered Compensation received during the 60 calendar months immediately preceding his retirement or other termination of service." The Second Amendment changed this last paragraph in a modification effective January 1, 1999, which provided, "In determining monthly 1997 Considered Compensation, the following

---

[2] This plan was later called the Pennzoil-Quaker State Company Employees Retirement Plan.

shall apply: (I) the term 1997 Considered Compensation shall be deemed to refer to the Member's Considered Compensation for the Member's 12 months of employment with the Employer immediately prior to January 1, 1998 . . ." In other words, it cut out the "lesser of" language and provided a simpler computation of Considered Compensation. The definition of Considered Compensation in effect under the original retirement plan (effective January 1, 1999) and the Second Amendment (also effective January 1, 1999) was "[t]he compensation actually paid to a Member . . . by his Employer for personal services, including normal salary, wages, commissions . . . but exclusive of . . . income arising from the exercise of a stock option . . ."[3] In other words, following the Second Amendment to the plan, the definition of Considered Compensation continued to omit income from the exercise of stock options.

A Fifth Amendment to the retirement plan, adopted on May 13, 2002, amended the definition of Considered Compensation in its entirety and included the exercise of stock options as part of Considered Compensation, defining Considered Compensation as "[t]he compensation actually paid to a Member by his Employer for personal services, including normal salary, wages, commissions . . . and income arising from the exercise or cash-out of a stock option, but exclusive of amounts of life insurance premiums paid by an employer . . ."[4] This Amendment had several effective dates. The Amendment stated, "Pennzoil-Quaker State Company . . . does hereby amend the Plan, effective March 1, 2002, as follows." It then made changes in Sections 1 and 2 to the definition of "Change of Control" and "Considered Compensation." In a third section, it added

---

[3] Emphasis added. This definition was in Section 1.11 of the retirement plan.

[4] Emphasis added.

a subsection entitled "Credit Union Employees" to Section 2.3 of the Salaried Employees Plan Document and specified that the third section was to be effective January 1, 2002.

In addition to the retirement plan, Pennzoil executed Letters of Agreement with some employees, including Crowell and Siegel. These Letters were unfunded deferred compensation arrangements and promised to pay the Letter recipients, upon a change in control of the company, a one-time cash payment. This payment was to compensate Crowell and Siegel for the amount of pension and savings money they would lose as a result of certain tax regulations. A determination of the amount of the one-time payment required a calculation of early retirement pension income under the retirement plan (a calculation relying upon the definition of 1997 Considered Compensation) and savings and investment income. Crowell's Letter of Agreement, dated December 8, 2000, with an effective date of June 19, 1999, provided,

> Section 415 of the Internal Revenue Code of 1986, as amended . . . imposes limitations on the amount of retirement benefits which may be payable with respect to any participating employee under the Pennzoil-Quaker State Company Salaried Employees Retirement Plan . . . and imposes limitations on the amount of annual additions which may be made to the account of any participating employee under the Pennzoil-Quaker State Company Savings and Investment Plan. . . . [The letter then discussed other tax limitations.] As these limitations may curtail the retirement benefits which would otherwise be payable to you and your spouse under the Retirement Plan and may curtail the contributions which the Company would otherwise make to your account under the Savings Plan, the Board of Directors of the Company has authorized the Company's direct payment to you and your spouse of certain amounts which are designed to recoup to you and your spouse any such losses . . .

In sections 1 and 2, the letter provided for long-term payments to be made to the employee and his spouse to offset reductions in benefits caused by taxes. These payments included

> monthly pension for life . . . commencing on the date your. . . Early Retirement . . . commences under the Retirement Plan . . . in an amount equal to any additional . . . Early Retirement . . . to which you would have been entitled under the Retirement Plan . . . , if the limitations therein for the purpose of satisfying Sections 415 and 401(a)(17) of the Code had not been applicable.

The Letter next described how the amount of recoupment for losses to savings caused by tax limitations would be calculated, providing in Paragraph 3,

> If during any calendar year commencing on or after January 1, 1999 because of application of the limitations included in the Savings Plan for the purpose of satisfying Sections 415 and 401(a)(17) of the Code, any Matching Contributions, which would otherwise be made to the Company for your account under the Savings Plan (or any successor thereto), are curtailed, the Company shall establish a Ledger Account and enter thereon as Dollar Equivalents the amount of the Matching Contribution which was not permitted to be made for your account because of such limitations. The Dollar Equivalents entered into the Ledger Account[5] shall be converted into Common Stock Equivalents equal to the number of shares of Common Stock of the Company, par value $0.10 per share . . . that could have been purchased by the Dollar Equivalents for your account. . . . After conversion of the Dollar Equivalents to Common Stock Equivalents, the Ledger Account shall be credited with additional Dollar Equivalents. . . . Following your termination of service with the Company, the amount of Common Stock Equivalents and any Dollar Equivalents credited to your account . . . shall be distributed to you at the time . . . such amount would

---

[5] Siegel's Letter of Agreement included an additional phrase here, which read, "for amounts earned while employed by the Company."

6

have been distributed to you if such amount had been held under, and subject to all the terms of , the Savings Plan . . .

It then explained that a cash recoupment would be distributed "as of the Effective Date of a change in control of the Company" and would include

> the amount to which you would be entitled under Paragraph 3 above . . . and using Value . . . for the purpose of converting Common Stock Equivalents and Dollar Equivalents to cash plus a cash payment equal to the present value of the benefits that would otherwise be provided to you and your spouse under Paragraphs 1 and 2 above [the monthly pension payments for life] . . . computed by reference to those actuarial and other factors set forth in Pennzoil-Quaker State Company Benefit Acceleration Agreement Administrative Procedures . . .

Siegel's Letter of Agreement had an effective date of December 30, 1998. It contained terms similar to those in Crowell's Letter of Agreement.

When Pennzoil changed control on October 1, 2002, this triggered Crowell's and Siegel's qualification for early retirement, meaning they would receive payments under the retirement plan beginning at age 55 and the cash payment under the Letters of Agreement. Defendants paid Siegel $776,221.92. Siegel alleged that this amount should have included as part of his Considered Compensation the money he received when he exercised 1997 stock options and should have totaled $1,434,423.10. Similarly, Defendants paid Crowell $42,988.05; he alleged that the company owed him $519,571.26, an amount calculated by including income from his exercise of a stock option in 1997. Siegel did not pursue the plan's administrative procedures for contesting benefits

7

payments,[6] urging in federal district court that exhaustion was unnecessary for the excess benefit agreement. Crowell pursued an internal appeal.[7] He contacted Kelley Lang, the plan administrator, to dispute the amount. Lang consulted with benefits attorneys and other individuals from human resources regarding plan interpretation and exchanged a series of letters with Crowell. Lang denied Crowell's benefits claim, explaining that the Fifth Amendment, effective March 1, 2002, as interpreted by her, did not include as part of Considered Compensation the exercise of stock options in 1997; rather, it only included the exercise of stock options "on or after March 1, 2002." Following an appeals hearing, Lang again denied Crowell's claim on May 14, 2004. Crowell and Siegel filed separate suits in state court, both maintaining that Defendants owed them a higher cash payment under the Letters of Agreement and alleging breach of express and implied-in-fact contract, breach of express and implied warranties, fraud, and promissory estoppel. Defendants removed the suits to federal district court. Siegel and Crowell filed motions to remand, which the district courts denied. Siegel and Crowell filed amended complaints with ERISA claims, and all parties filed cross motions for summary judgment. The cases were consolidated, and the district court granted Defendants' motions for summary judgment. The district court found that "Siegel was . . . required to

---

[6] The district court held that Siegel's claim was premature as he had failed to exhaust his administrative remedies under the plan, and Appellees so argue here. The district court did, however, rule on the merits of Siegel's claim. On appeal, Siegel does not contend that he exhausted his remedies.

[7] Pennzoil concedes that "Crowell invoked the Retirement Plan's administrative procedures to contest the issue now before the Court."

seek the administrative remedies of the Retirement Plan before filing suit"[8] and that he had failed to do so. It concluded that "his benefits claim should be dismissed"[9] but still addressed the merits of his claim, finding that a stay of the proceedings to allow Siegel to exhaust his remedies was unnecessary.[10] Next, reviewing the propriety of Lang's benefit decision under an abuse of discretion standard, the court concluded that Defendants had not abused their discretion in denying Crowell's benefits, as they "gave a legally correct interpretation of the plan provision in question."[11] Finally, the court dismissed Crowell's claim that Lang had failed to disclose certain documents and denied plaintiffs' claim for attorneys' fees and costs.

Plaintiffs appealed, urging that 1) the district courts that initially addressed their individual suits erred in denying their motions to remand, as Defendants' notices of removal were procedurally defective, ERISA does not apply to the Letters of Agreement at issue in the case, and even if ERISA does apply, the letters fall under an ERISA exemption, 2) the district court that addressed Plaintiffs' consolidated suit failed to consider the summary judgment evidence in the light most favorable to Plaintiffs, the non-moving party, and 3) the district court applied an incorrect standard of review in addressing Defendants' denial of Plaintiffs' benefits and erred in affirming the denial, thus erring in granting summary judgment for Defendants and failing to grant summary judgment for Plaintiffs. We address each of these in turn.

---

[8] Crowell v. Shell Oil Co., 481 F.Supp. 2d 797, 808 (S.D. Tex. 2007).

[9] Id.

[10] Id. at 808 n.7.

[11] Id. at 813.

II

Plaintiffs first contend that the district courts that addressed their suits prior to consolidation erred in denying their motion to remand and holding that ERISA preemption applied.  They maintain that Defendants failed to meet the procedural requirements in their notice of removal and that, even absent procedural errors, ERISA preemption should not apply because the Letters of Agreement providing for a cash payment are not a "plan" under ERISA.  Finally, they urge that even if the letters are a "plan," they fall under a statutory exemption to ERISA. We review de novo a district court's denial of a motion to remand.[12]

Plaintiffs urge that Defendants' notice of removal was procedurally defective because it failed to "include an affirmative statement that all defendants who have been properly served at the time of removal have consented in writing" to removal.  They maintain that this violates the rule that "all served defendants must join in the petition no later than thirty days from the day on which the first defendant was served."[13]  But all individual defendants were listed in the notice of removal.  For example, Defendants' Notice of Removal under 28 U.S.C. § 1331 in Crowell's case stated, "Please take notice that Defendants Shell Oil Company f/k/a or d/b/a Pennzoil-Quaker State Company, Shell Oil Products Company LLC, Pennzoil-Quaker State Company, Catherine Lamboley and Kelley Lang file this Notice of Removal, and hereby remove to this Court the action described below."  And Plaintiffs fail to cite to legal provisions requiring all defendants to consent to removal in writing.  Rather, they cite to

---

[12] Woods v. Tex. Aggregates, L.L.C., 459 F.3d 600, 601 (5th Cir. 2006).

[13] Getty Oil Corp. v. Ins. Co. of N. Am., 841 F.2d 1254, 1263 (5th Cir. 1988).

the statute that requires defendants requesting removal to "file in the district court. . . . a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." Rule 11 requires that each pleading, motion, or paper "be signed by at least one attorney of record in the attorney's name" and "state the signer's address, e-mail address, and telephone number." In signing a pleading, motion, or other paper, the attorney also certifies generally that the paper is not being presented for an improper purpose, has evidentiary support or will have support upon further investigation, and the claims are warranted by law or a change in the law.[14] Plaintiffs do not contend that the notice of removal failed to describe the grounds for removal, or that it was not signed pursuant to Rule 11's requirements. We find no procedural error.

Next, plaintiffs contend that ERISA preemption does not apply to the Letters of Agreement, which provide benefits above and beyond those described in the retirement plan, urging that the Letters of Agreement are not a "plan." As such, they maintain, state law should apply to their claims arising from the Letters of Agreement.

ERISA preempts any state laws that relate to employee benefit plans, providing:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate

---

[14] Fed. R. Civ. P. 11(a), (b).

to any employee benefit plan described in section 1002(a) of this title and not exempt under section 1003(b) of this title.[15]

"A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."[16] If state law relates to an employee benefit plan, ERISA applies to such a plan and preempts state law:

> Except as provided in subsection (b) [governmental plans and church plans] or (c) [pension plans with voluntary employee contributions] of this section and in sections 1051, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan that is established or maintained –
> (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or
> (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or
> (3) by both.

ERISA defines a "plan" as follows:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit

---

[15] 29 U.S.C. § 1144(a).

[16] Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983).

described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).[17]

We must look to the case law to determine whether the Letters of Agreement are "plans" as defined by ERISA and whether state or federal law applies, as the statutory language does not provide a full answer.[18] The Supreme Court in Fort Halifax Packing Co. defined an ERISA plan in terms of the administrative activities required to coordinate and provide benefits under the plan, holding that an ERISA plan covers "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation."[19] A one-time benefit, on the other hand, such as a "one-time, lump-sum payment triggered by a single event," a payment that "requires no administrative scheme whatsoever to meet the employer's obligation" to pay the employee, is not a plan as defined by ERISA.[20] In Fort Halifax, a Maine statute required employers who relocated or terminated their business to pay "employees for severance pay at the rate of one week's pay for each year of employment by the employee" in the business.[21] The employer was to make this payment "within one regular pay period after the employee's last full day of work."[22] The Court looked to "the plain language of

---

[17] 29 U.S.C. § 1002 (1).

[18] See Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 8 (1987) (citing 29 U.S.C. § 1002(3)) (observing that "the terms 'employee benefit plan' and 'plan' are defined only tautologically in the statute").

[19] Id. at 11.

[20] Id. at 12.

[21] Id. at 4 n.1.

[22] Id.

ERISA's pre-emption provision, the underlying purpose of that provision, and the overall objectives of ERISA itself"[23] to determine that the statute did not regulate plans as defined by ERISA. With respect to the plain language, the Court observed that ERISA "does not refer to state law relating to 'employee benefits,' but rather 'employee benefit plans.'"[24] Although "the words 'relate to' should be construed expansively," Congress pre-empts only those laws that relate to plans.[25]

The Court next asked whether preemption of Maine's severance statute would "further the purpose of ERISA pre-emption"[26] and meet ERISA's overall objectives – whether it would help to "establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of benefits" and prevent "differing regulatory requirements in differing States"[27] relating to the administration of plans. The Court observed,

> Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation.[28]

And the Court concluded,

---

[23] Id. at 7.

[24] Id.

[25] Id. at 8.

[26] Id. at 9.

[27] Id.

[28] Id. at 11.

> The Maine statute . . . creates no impediment to an employer's adoption of a uniform benefit administration scheme. Neither the possibility of a one-time payment in the future, nor the act of making such a payment, in any way creates the potential for the type of conflicting regulation of benefit plans that ERISA pre-emption was intended to prevent.[29]

Finally, the Court looked to ERISA's "regulatory concerns,"[30] which are to provide "'safeguards . . . with respect to the establishment, operation, and administration'"[31] of employee benefit plans, "'prevent abuses of the special responsibilities borne by those dealing with plans,'"[32] "safeguard employees from 'such abuses as self-dealing, imprudent investing, and misappropriation of plan funds,'"[33] and "provide employees information 'covering in detail the fiscal operations of their plan.'"[34]

Applying a similar analysis to the present letters of agreement, we note several important distinctions. First, although the benefits at issue here involve a cash payment, this payment is embedded within a letter that includes a more comprehensive "plan." Paragraphs 1 and 2 of the Letters of Agreement provide for a "monthly pension for life" equal to the difference between the pension with and without certain tax limitations, paid to the employer and the employer's

---

[29] Id. at 14.

[30] Id. at 15.

[31] Id. (quoting 29 U.S.C. § 1001(a)).

[32] Id. (quoting remarks of Representative Dent, 120 Cong. Rec. 29197 (1974)).

[33] Id. (quoting remarks of Senator Williams, 120 Cong. Rec. 29932 (1974)).

[34] Id. at 16 (quoting remarks of Senator Javits, 120 Cong. Rec. 29935 (1974)) (emphasis omitted).

spouse following a change of control. Paragraph 3 then promises a one-time cash payment for the present value of the amount by which the monthly benefits will decrease as a result of certain provisions of the Internal Revenue Code.[35] Second, the Letters of Agreement providing for monthly pensions and a one-time payment commencing upon the change in control rely directly on calculations made in Pennzoil's employee benefits plans – the Pennzoil-Quaker State Company Salaried Employees Retirement Plan and the Pennzoil-Quaker State Company Savings and Investment Plan. The Letters of Agreement state,

> As these limitations [in Sections 415 and 401(a)(17) of the Internal Revenue Code of 1986] may curtail the retirement benefits which would otherwise be payable to you and your spouse under the Retirement Plan and may curtail the contributions which the Company would otherwise make to your account under the Savings Plan, the Board of Directors of the Company has authorized the Company's direct payment to you and your spouse of certain amounts which are designed to recoup to you and your spouse any such losses . . . .

The provision for a one-time cash payment also contains explicit language about the "administrative procedures" required for calculation, stating that the cash payment shall be "determined as of the date prior to the Effective Date of the change in control and computed by reference to those actuarial and other factors set forth in the Pennzoil-Quaker State Company Benefit Acceleration

---

[35] Paragraph 3 of Siegel's Letter of Agreement with Pennzoil (Dec. 30, 1998) stated, "Notwithstanding the foregoing provisions of this Agreement, as of the Effective Date of a change in control of the Company . . . you will receive from the Company forthwith . . . a cash payment equal to the present value of the benefits that would otherwise be provided to you and your spouse under Paragraphs 1 and 2 above, determined as of the date prior to the Effective Date of the change in control and computed by reference to those actuarial and other factors set forth in the Pennzoil-Quaker State Company Benefit Acceleration Agreement Administrative Procedures in effect at the applicable date."

Agreement Administrative Procedures in effect at the applicable date." The Letters of Agreement, including the portions referring to the one-time cash payment upon a change of control of Pennzoil, require ongoing administrative involvement. Interpreting the Letters of Agreement as ERISA "plans" also furthers the purpose of ERISA pre-emption.[36] If the laws and regulations relating to the interpretation and administration of the Letters of Agreement and the retirement plan used to calculate some of the benefits under the Letters of Agreement were not uniform, this could lead to differing outcomes.

The Letters of Agreement are also distinct from the one-time termination benefit distributed in Wells v. General Motors Corp.[37] and the cash severance payment issued upon a change of control in Fontenot NL Industries, Inc.[38] In Wells, GM was downsizing and offered employees a "Voluntary Termination of Employment Plan," wherein they could receive severance pay "either in lump-sum or two-year installment payments" in exchange for agreeing to resign.[39]

---

[36] Fort Halifax, 482 U.S. at 11.

[37] 881 F.2d 166, 175-76 (5th Cir. 1989); see also Wells v. Gen. Motors Corp., 721 F.Supp. 107, 115 (S.D. Miss. 1988) ("In the present case, it is clear that the purpose of GM in instituting VTEP [Voluntary Termination of Employment Plan] was not to provide its employees with benefits under the Act but was instead to reduce its work force because of the poor conditions of the industry and of GM. And, in the court's view, the termination plan adopted by GM was not such a plan as envisioned by ERISA. Most of the payments to employees were made on a single payment basis and were made solely for the purpose of employee attrition."). The Voluntary Termination of Employment Plan in Wells "permitted employees to sell their seniority back to the company and terminate their employment in exchange for monetary payment." Id. at 109. "[E]ach of the plaintiffs ultimately chose to accept the VTEP option and received payments ranging from $10,000 to $22,000, depending on their years of seniority." Id.

[38] 953 F.2d 960, 961 (5th Cir. 1992).

[39] 881 F.2d at 168.

This court found that ERISA's preemptive force is "broad" but "not so broad as to reach" GM's Voluntary Termination of Employment Plan.[40] Wells concluded that

> [t]he operative facts in Fort Halifax are remarkably similar to those in the instant case. GM established a procedure by which employees could elect to receive a one-time lump payment if they ceased working at the plant. The plan was not ongoing, nor was there any need for continuing administration of the payment program (though employees could elect a two-year installment payment option).[41]

As the district court in Wells described the benefits,

> In the present case, it is clear that the purpose of GM in instituting . . . [a Voluntary Termination of Employment Plan] was not to provide its employees with benefits under the Act but was instead to reduce its work force because of the poor conditions of the industry and of GM. And, in the court's view, the termination plan adopted by GM was not such a plan as envisioned by ERISA. Most of the payments to employees were made on a single payment basis and were made solely for the purpose of employee attrition.[42]

The plan in Wells "permitted employees to sell their seniority back to the company and terminate their employment in exchange for monetary payment."[43] "[E]ach of the plaintiffs ultimately chose to accept the VTEP [Voluntary Termination Employment Plan] option and received payments ranging from

---

[40] Id. at 172.

[41] Id. at 176.

[42] Wells, 721 F.Supp. at 115.

[43] Id. at 109.

$10,000 to $22,000, depending on their years of seniority.[44]  Although the individual cash payment in this case does not itself require continuing administration, the letter of which it is a part contains other provisions that do. As we have discussed, the cash payment to Crowell and Siegel relies upon calculations made under plans that require continuing administration, and that Letter of Agreement refers specifically to administrative procedures that must be followed.  The payments under the Letters of Agreement would differ substantially depending on the calculations made under the retirement and savings plans for each employee terminated upon a change in control.

Finally, the lump sum payments in Fontenot, like those in Wells, did not rely upon a comprehensive plan or administrative plan, unlike the cash payments here.  Fontenot addressed a "golden parachute" plan – a "Senior Executive Severance Plan – provided by NL Industries to certain employees.[45] This court found the payments under the golden parachute plan to be indistinguishable from the plans in Wells and Fort Halifax,[46] quoting the district court's finding that the golden parachute plan

> required Defendant to make only a one-time lump sum payment to certain employees.  The requirement to pay was triggered by a single event. . . .  – a contingency that may never have materialized. . . . This theoretical possibility of a one-time obligation in the future created no need for an on-going administrative program to process claims and pay benefits.[47]

---

[44] Id.

[45] 953 F.2d at 961.

[46] Id. at 962.

[47] Id.

Plaintiffs urge that the letters are "indisputably" similar to those in Wells and Fontenot because "each compensation scheme provided no opportunity for any exercise of discretion regarding the determination of whether an employee would receive compensation under the scheme, or how much compensation would be received." This fails to recognize the discretion required in making benefits determinations under several portions of the Letters of Agreement, including the determination of monthly amounts due under the retirement plan, amounts owed under the savings plan, the tax limitations on those amounts due, and the "Dollar Equivalent" and "Common Stock Equivalent" calculations. Unlike the plans in Wells and Fontenot, the Letters of Agreement "establish[] . . . [or] require[] an employer to maintain, an employee welfare benefit 'plan'"[48] and are "plans" as defined by ERISA. The district court did not err in denying Plaintiffs' motion to remand the case to state court.

Plaintiffs maintain that even if ERISA applies, the Letters of Agreement are "excess benefit plans" that fall under an ERISA exemption. Accordingly, they urge, this case should not fall under ERISA. The exemption in 28 U.S.C. § 1003(b)(5) provides, "The provisions of this subchapter shall not apply to any employee benefit plan if – such plan is an excess benefit plan (as defined in section 1002(36) of this title) and is unfunded." Section 1002(36) defines an excess benefit plan as

> a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies without regard to whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer

---

[48] Fort Halifax, 482 U.S. at 6.

20

is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan.

We are not persuaded that the Letters of Agreement are "excess benefit plans" that fall under this exemption. As the language of the statute provides, excess benefit plans under ERISA are plans "maintained . . . solely for the purpose of providing benefits . . . in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies."[49] The Letters of Agreement provide for a monthly pension for life for the employee and the employee's spouse, as well as payments to counteract the limitations of Sections 415 and 401(a)(17) of the Internal Revenue Code. The plans are not solely to provide benefits in excess of limitations imposed by Section 415.[50]

## III

Having determined that ERISA applies to the Letters of Agreement, we move to the exhaustion issue. "This court requires that claimants seeking benefits from an ERISA plan . . . first exhaust available administrative remedies under the plan before bringing suit to recover benefits."[51] The district court found that "Siegel never invoked the Plan's appeals procedures to contest Pennzoil's construction of the Plan's terms,"[52] that he was required to invoke

---

[49] 28 U.S.C. § 1002 (36).

[50] See, e.g., Garratt v. Knowles, 245 F.3d 941, 948 (7th Cir. 2001) (finding no exemption where a plan "had the purpose of avoiding not only the limitations contained in § 415 of the Internal Revenue Code, but also those limitations contained in § 401(a)(17) of Title 26").

[51] Bourgeois v. Pension Plan for the Employees of Santa Fe Int'l Corps., 215 F.3d 475, 479 (5th Cir.2000) (citing Denton v. First Nat'l Bank of Waco, 765 F.2d 1295, 1300 (5th Cir.1985)).

[52] Crowell, 481 F.Supp. 2d at 803.

these procedures, and that accordingly his "benefits claim should be dismissed."[53] It nevertheless addressed Siegel's challenge to the benefits denial, finding that a stay of the proceedings to allow for exhaustion as requested by Siegel was unnecessary because both Crowell's and Siegel's challenges to the benefits denial were "insufficient as a matter of law."[54] The court concluded in its final judgment, "[J]udgment is granted in favor of defendants on plaintiffs' § 1132(a)(1) benefits claims and Crowell's § 1132(c) nondisclosure claim."

Siegel does not raise the exhaustion issue on appeal, contesting neither the district court's refusal to stay the proceedings to give Siegel the opportunity to exhaust nor its determination that he failed to exhaust available administrative remedies. Defendants urge on appeal that "the District Court properly held that . . . [Siegel's] lawsuit was premature" due to his failure to exhaust and that "by failing to address an alternate basis for dismissal" in his brief, Siegel has abandoned any exhaustion arguments.[55] Although Siegel did not challenge here

---

[53] Id. at 808.

[54] The court stated in a footnote,

> Rather than dismiss his case outright, Siegel requests that the court stay the proceedings so that he may pursue administrative remedies. In other circumstances the court might agree. But in this case the parties have already briefed the court on the merits of the benefits claim in both suits, and the court is ready to rule. And as the court finds Crowell's identical claim insufficient as a matter of law, see infra, there is no need to stay Siegel's case when the same unfavorable outcome is assured. The court thus will reach the merits of Shell's summary judgment motions in both cases.

Crowell, 481 F.Supp. 2d at 808 n.7 (internal citation omitted).

[55] Citing Sookma v. Millard, 151 Fed. Appx. 299, 301 (5th Cir. 2005); Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993).

22

the district court's refusal to stay the proceedings to allow exhaustion, it is of no moment. The district court addressed his claim on the merits, and he appeals that decision. We have the merits of Crowell's claim before us with no shadow of non-exhaustion, and exhaustion is not here a jurisdictional requirement. "[W]e have never construed the [ERISA exhaustion] doctrine strictly as a jurisdictional bar"[56] and have referred to it as a "defense."[57] Other circuits have expressly held that ERISA exhaustion is not jurisdictional,[58] and we agree. While the district court stepped over the defense of exhaustion, Defendants are the beneficiary, winning on the merits. With these facts we resolve the merits of both Siegel's and Crowell's appeal.

## IV

Plaintiffs maintain that the district court "indulged every reasonable inference (and then some) in Shell's favor," made "evidentiary findings reserved

---

[56] Transitional Learning Ctr. at Galveston v. Metro. Life Ins. Co., 1996 WL 625412 at *1 (No. 96-40154, 5th Cir. Oct. 19, 1996) (unpublished) (citing Medina v. Anthem Life Ins. Co., 983 F.2d 29, 33 (5th Cir. 1993)); see also Bourgeois, 215 F.3d at 481 (holding in the ERISA context that "a court should not relinquish its jurisdiction because of a failure to exhaust administrative remedies when there was a valid reason for such failure").

[57] Transitional Learning Ctr., 1996 WL 625412 at *1 ; see also Bourgeois, 215 F.3d at 479 (discussing "the affirmative defense of failure to exhaust administrative remedies" in the context of an ERISA plan (citing Hall v. National Gypsum Co., 105 F.3d 225, 232 (5th Cir.1997))).

[58] See, e.g., Metro. Life Ins. Co. v. Price, 501 F.3d 271, 279-80 (3d. Cir. 2007) (observing that "Congress has expressly provided for jurisdiction over ERISA cases in 29 U.S.C. § 1132(e). Neither that provision nor any other part of ERISA contains an exhaustion requirement. Thus, as a judicially-crafted doctrine, exhaustion places no limits on a court's adjudicatory power" and holding that "ERISA's exhaustion doctrine places no limits on a federal court's subject matter jurisdiction"); Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 445-46 (2d Cir. 2006) (finding that ERISA's exhaustion requirement is "purely a judge-made concept that developed in the absence of statutory language demonstrating that Congress intended to make ERISA administrative exhaustion a jurisdictional requirement" and concluding that ERISA exhaustion is an affirmative defense (emphasis added)).

for a trial setting," and admitted "hearsay . . . offered by Shell as undisputed fact." "Time and again," they urge, "the District Court's opinion concedes the strength of Appellants' arguments, the[n] proceeds to make 'findings' that Appellees' arguments are more compelling." Plaintiffs conclude that the court "misapplied the standards for review of a summary judgment."

Drawing all factual inferences in Plaintiffs' (the non-movants') favor, the court came to the legal conclusion that it should grant Defendants' summary judgment claims.[59] This is the proper summary judgment standard. A court is not required to draw legal inferences in the non-movant's favor on summary judgment review. Furthermore, the district court did not admit the evidence that plaintiffs describe as "hearsay" – evidence of Lang's consultations with a benefits attorney and senior counsel, the payroll director, and Pennzoil's former Vice President of Human Resources – to help establish the truth of the matter asserted. In discussing Lang's consultation with these individuals, the district court summarized the course of events and looked to the plan interpretations given by various employees to Lang before Lang made the ultimate decision.[60]

---

[59] Plaintiffs point, for example, to the district court's statement that "Siegel's contention is clever, but ultimately unpersuasive." This statement related to Siegel's legal contention that "the exhaustion requirement is inapplicable to his case." Plaintiffs also point to the court's statement that "[i]n other circumstances the court might agree" and "[a]t first blush, plaintiffs' argument seems logical. Upon closer inspection, however, its intellectual force dissipates." Both of these statements also related to Plaintiffs' legal and interpretive, as opposed to fact-based, arguments – the first to Siegel's request that "[r]ather than dismiss his case outright . . . that the court stay the proceedings so that he may pursue administrative remedies," and the second to Plaintiffs' contention that construing a plan amendment one way "would 'cripple retirees' benefits,' and this result cannot have been the intent of the Fifth Amendment."

[60] See, e.g., Corry v. Liberty Life Assur. Co. of Boston, 499 F.3d 389, 398 n.12 (5th Cir. 2007) (holding that "'the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it'" and that it was not an abuse of discretion

Nor do Plaintiffs maintain that they objected to the admissibility of the alleged hearsay in district court.

V

Finally, we address Plaintiffs' contention that the district court erred in upholding the administrator's denial of benefits to Plaintiffs. Plaintiffs maintain that the district court "applied the incorrect standard of review for a denial of benefits under ERISA" in applying an abuse of discretion standard. They urge that the standard is de novo because "Shell was not expressly given discretionary authority to determine eligibility for benefits nor was it given any authority to construe the plan's terms." When a plan gives a trustee the power to exercise discretionary powers, a district court appropriately reviews a denial of benefits for an abuse of discretion. Where a plan does not grant such discretion, de novo review is appropriate.[61] Crowell's and Siegel's retirement plans, which formed much of the basis for calculating the benefits provided under the Letters of Agreement, provided,

> The Retirement Board, on behalf of the Members, Spouses and Contingent Annuitants, shall enforce this Plan in accordance with its terms and shall have all powers necessary for the accomplishment of that purpose, including, but not by way of limitation, the following powers: (a) To construe and interpret the Plan, decide all questions or [sic] eligibility and determine the amount, manner and time of payment of any benefits hereunder . . . . (i) To interpret and construe all terms, provisions, conditions and limitations of this Plan and to reconcile any inconsistency or supply any omitted detail that may appear in this Plan and to such extent, consistent with the general terms of this Plan, as the Retirement

_____

for the district court to admit this information (quoting Vega v. Nat'l Life Ins. Serv., Inc., 188 F.3d 287, 300 (5th Cir.1999) (en banc))).

[61] Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 112-13 (1989).

Board shall deem necessary and proper to effectuate the Plan for the greatest benefit of all the parties interested in the Plan . . .

The plans as amended also gave the Board this authority, providing in the Fifth Amendment that the Retirement Board's determination of the Considered Compensation of a Member would be "conclusive." The Seventh Circuit has held that where a supplemental benefits plan expressly incorporates the terms of a retirement plan, and the retirement plan gives the administrator the discretion to interpret the plan terms, the appropriate standard of review is an abuse of discretion.[62] We have not addressed this issue but agree with the Seventh Circuit's reasoning. While the Letters of Agreement do not expressly incorporate the retirement plan terms, they rely directly on calculations under the retirement plan to determine benefits due, compensating employees for limitations imposed by the Internal Revenue Code "on the amount of retirement benefits which may be payable with respect to any participating employee under the Pennzoil-Quaker State Company Salaried Employees Retirement Plan (the 'Retirement Plan'). . . ." As the retirement plan gives the administrator full discretion to determine eligibility for benefits, abuse of discretion review also logically applies to the determination of benefits under the Letters of Agreement.[63] The district court did not err in applying an abuse of discretion

---

[62] See Olander v. Bucyrus-Erie Co., 187 F.3d 599, 604-07 (7th Cir. 1999) (where a supplementary pension benefit plan "incorporated parts of . . . [a retirement plan] by reference," and the retirement plan gave the fiduciary discretion to determine benefit eligibility, the proper standard of review was an abuse of discretion).

[63] See, e.g., Edwards v. Texas-New Mexico Power Co., 259 F.Supp. 2d 544 (N.D. Tex. 2003) (abuse of discretion review applied to a benefits interpretation under a supplemental retirement plan where "[d]etermination of benefits under the excess benefit plan, as supplemented by the supplemental employee retirement plan ('SERP'), necessarily depended upon the underlying pension plan, which contained the relevant terms and definitions. The

standard. As the district court found in the context of exhaustion, a benefits claim under each Letter of Agreement – what the court called the "Excess Plan" – "is inseparable from an interpretation of the Retirement Plan."[64] "When excess plans entirely depend on the definitions of a companion retirement plan, the court should exercise deference in reviewing the interpretations of an administrator with discretionary authority."[65]

Plaintiffs maintain that even if an abuse of discretion standard of review applies, the district court should have afforded less deference to the plan administrator's determination because "the decision maker is an insurer paying claims out of its own assets" and has a conflict of interest.[66] The district court found that "Crowell . . . presented no evidence of a conflict of interest other than to assert that Lang, a Shell employee, is 'manifestly' operating under a conflict because any benefits granted to Crowell will also be paid by Shell, the plan

---

pension plan also gave the plan administrator 'complete and final discretionary authority to construe and interpret' the plan").

[64] Crowell, 481 F.Supp. 2d at 808.

[65] Id. at 809.

[66] Indeed, less deference is due where a plaintiff sufficiently alleges that conflict of interest exists. See MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 478-79 (5th Cir. 2003) ("Where . . . an administrator's decision is tainted by a conflict of interest, the court employs a "sliding scale" to evaluating whether there was an abuse of discretion. This approach does not mark a change in the applicable standard, but only requires the court to reduce the amount of deference it provides to an administrator's decision. . . .The degree to which a court must abrogate its deference to the administrator depends on the extent to which the challenging party has succeeded in substantiating its claim that there is a conflict." (citations and internal citations omitted)).

sponsor."[67]  Until recently, this bare assertion was insufficient to establish a conflict of interest claim.  As we observed in MacLachlan v. ExxonMobil Corp.,

> The mere fact that benefit claims are decided by a paid human resources administrator who works for the defendant corporation does not, without more, suffice to create an inherent conflict of interest. Were that enough, there would be a near-presumption of a conflict of interest in every case in which an employer both offers a plan and pays someone to administer it, making a full application of the abuse of discretion standard the exception, not the rule.[68]

In their appellate brief, Plaintiffs argue, as they did before the district court, that "[i]n the instant case, Appellees are, manifestly, operating under a conflict of interest, as any benefits paid come directly out of Appellees [sic] fisc, and payment of Appellant's [sic] claims may set a precedent for enhanced benefits for many other retirees."  Although formerly insufficient under MacLachlan, this claim meets the conflict of interest standard recently elucidated by the Supreme Court in Metropolitan Life Insurance Company v. Glenn.  The Supreme Court held that "the fact that a plan administrator both evaluates claims for benefits and pays benefits claims creates the kind of 'conflict of interest'"[69] discussed in Firestone – wherein "[i]f 'a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest,'"[70] we must take that conflict into consideration.

---

[67] Crowell, 481 F.Supp. 2d at 810 n.9.

[68] 350 F.3d at 479 n.8.

[69] 128 S.Ct. 2343, 2348 (2008).

[70] Id. (quoting Firestone, 489 U.S. at 115).

We review de novo the district court's conclusion that the plan administrator did not abuse her discretion in denying Plaintiffs' benefits,[71] applying an abuse of discretion review to the benefits denial and following a two-step process.[72] We first ask whether the plan administrator's determination was "legally correct."[73] If it was, our inquiry ends here; if not, we ask whether the determination was an abuse of discretion.[74] Because the administrator had a conflict of interest, we weigh the conflict of interest as a "'factor in determining whether there is an abuse of discretion'"[75] in the benefits denial, meaning we "take account of several different considerations of which conflict of interest is one."[76]

---

[71] Pickrom v. Belger Cartage Serv., Inc., 57 F.3d 468, 471 (5th Cir. 1995) (citing Chevron Chem. Co. v. Oil, Chem. and Atomic Workers Local Union 4-447, 47 F.3d 139, 144 (5th Cir.1995)).

[72] Id. ("We apply the abuse of discretion standard through a two-step inquiry," and, under the first step, "address the question of whether the Trustees' interpretation of the Pension Plan was legally correct," looking to "the facts in the record and the language of the Pension Plan itself").

[73] Threadgill v. Prudential Sec. Group, Inc., 145 F.3d 286, 292 (5th Cir. 1998); see also Wildbur v. ARCO Chemical Co., 974 F.2d 631, 637 (5th Cir. 1992) ("Application of the abuse of discretion standard may involve a two-step process. First, a court must determine the legally correct interpretation of the plan. If the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion.").

[74] See Threadgill, 145 F.3d at 293; see also Tolson v. Avondale Indus., Inc., 141 F.3d 604, 608 (5th Cir.1998) ("Only if the court determines that the administrator did not give the plan the legally incorrect interpretation, must the court then determine whether the administrator's decision was an abuse of discretion.").

[75] Metro. Life, 128 S.Ct. at 2350 (quoting Firestone, 489 U.S. at 115).

[76] Id. at 2351.

To determine whether the district court erred in finding that the administrator's interpretation of a plan is legally correct, we look to

(1) whether the administrator has given the plan a uniform construction,
(2) whether the interpretation is consistent with a fair reading of the plan, and
(3) any unanticipated costs resulting from different interpretations of the plan.[77]

"[W]hether the administrator's interpretation is consistent with a fair reading of the plan" is "the most important factor to consider"[78] in the three-step analysis.

In denying Crowell's benefits claim, Lang stated,

The Plan was amended on May 13, 2002, (by the Fifth Amendment to the Plan) to change the definition of Considered Compensation to include "income arising from the exercise or cash-out of a stock option." This amendment was effective March 1, 2002. By making this amendment effective March 1, 2002, I have determined that the intent of the amendment was to apply prospectively only to income received by an employee arising from the exercise of a PQS stock option on or after March 1, 2002, and that the intent of the amendment was not to require the Plan to recalculate the Considered Compensation for every Member of the Plan from 1997 forward based upon the exercise of stock options in 1997 and later.

My interpretation of the Fifth Amendment to the Plan is bolstered by the actual administration of the Plan since May of 2002. . . . Since the adoption of the Fifth Amendment, the only stock option exercises that have been taken into account in calculating the Considered Compensation under the Plan have been those that were exercised on or after March 1, 2002 and prior to March 1, 2002. . .

---

[77] Threadgill, 145 F.3d at 292-93 (quoting Wildbur, 974 F.2d at 637-38).

[78] Gosselink v. AT&T, Inc., 272 F.3d 722, 727 (5th Cir. 2001).

. No Member . . . has been credited under the Plan's definition of Considered Compensation with the income resulting from any exercise of a stock option prior to March 1, 2002.

Similarly, Defendants omitted income from Siegel's exercise of 1997 stock options in calculating Siegel's cash payment. The district court found that Defendants' interpretation of the Fifth Amendment, which included "only income realized from option exercises on or after March 1, 2002, but not before, within Considered Compensation,"[79] was "uniformly applied in determining Crowell['s] . . . pensionable earnings."[80] Plaintiffs maintain that Lang's decision was not uniformly applied, urging that "'[p]hantom income' was included in several of the executives' Considered Compensation for purposes of a retirement plan calculation."[81] But as the district court recognized, the "phantom income" versus "actual earnings" question arose under a different part of the Fifth Amendment unrelated to the definition of Considered Compensation.[82] Furthermore, Plaintiffs concede in their brief, regarding the phantom income issue, that "for 2003, 2004, and 2005," Siegel received as part of "Total Pensionable Earnings"

---

[79] Crowell, 481 F.Supp. 2d at 810.

[80] Id.

[81] Plaintiffs further urge that "[t]he Fifth Amendment's replacement definition does not distinguish 'wages' from 'option' income, and if Lang's logic is applied uniformly, "'Considered Compensation' can . . . only include normal wages and salary actually paid on or after the March 1, 2002 effective date." Lang did not, they maintain, limit normal wages and salary. This is in the same vein as the "phantom income" arguments, as Plaintiffs do not contend that Lang included any other Member's income from stock option exercises in pensionable income; rather, they more generally urge that Lang failed to limit pensionable income to normal wages and salary.

[82] See Crowell, 481 F.Supp. 2d at 811 (describing Siegel's claims regarding phantom income versus actual earnings as claims involving the inconsistent application of "other Fifth Amendment provisions not at issue in this litigation").

31

"income which Siegel did not 'actually receive.'" This income was from a provision in Siegel's severance agreement, not the Letters of Agreement at issue here, and did not involve questions of income "actually received" or not received in 1997. Plaintiffs also urge that "the Ninth Amendment, which has an effective date of March 7, 2003, was actually interpreted by Shell to include options cashed out prior to that effective day." The Ninth Amendment addressed income from stock options after March 1, 2003, and provided that such income would be excluded from considered compensation. Analysis of the Ninth Amendment does not explain whether or how Shell inconsistently applied the definition of Considered Compensation to the exercise of 1997 stock options. Finally, Plaintiffs point to the Fifth Amendment's language, urging, "If we apply Lang's construction 'logic' in a uniform manner to the entire definition of 'Considered Compensation' set forth in the Fifth Amendment . . . it necessarily follows that 'Considered Compensation' also can only include normal wages and salary actually paid on or after the March 1, 2002 effective date." This is a fair reading argument, not an argument as to whether Lang uniformly applied the Considered Compensation portion of the plan to other similarly situated employees. Plaintiffs have failed to point to any record evidence showing a non-uniform construction of the "Considered Compensation" portion of the plan as it applied to Crowell, Siegel, and other plan participants with stock option earnings from 1997.[83]

---

[83] See, e.g., Batchelor v. Int'l Brotherhood of Electrical Workers Local 861 Pension and Retirement Fund, 877 F.2d 441, 444-45 (5th Cir. 1989) (under the uniformity question, asking whether the parties had presented evidence as to whether the administrators had awarded a particular type of benefit ("past service credit") specifically to "people with . . . [plaintiff's] employment history").

As to the next element of the "legally correct" inquiry – the fair reading issue – Plaintiffs urge that "Lang's decision to apply the effective date of the Fifth Amendment one way to part of the replacement definition of 'Considered Compensation' and a different way to another part of the same sentence of the same definition, . . . cannot be seen as anything but an unfair reading of the Fifth Amendment and of the Plan." In other words, as summarized by the district court, they maintain that the "exclusion of option exercises before March 1, 2002 means that wages and salary earned before that date should also be excluded, if the effective date determines the beginnings of earnings calculations."[84] We are not convinced.

> [T]he "[e]ligibility for benefits under any ERISA plan is governed in the first instance by the plain meaning of the plan language." We interpret ERISA plans "in [their] ordinary and popular sense as would a person of average intelligence and experience." In other words, we must interpret ERISA provisions as they are likely to be "understood by the average plan participant, consistent with the statutory language."[85]

The original plan definition of Considered Compensation in Crowell's and Siegel's retirement plans, effective January 1, 1999, read as follows:

> <u>Considered Compensation</u>: The compensation actually paid to a member . . . by his Employer for personal services, including normal salary, wages, commissions, overtime pay, severance pay . . . , vacation pay, pay in lieu of vacation, bonuses and amounts distributed under any unfunded plan of deferred compensation . . .

---

[84] Crowell, 481 F.Supp. 2d at 812.

[85] Tucker v. Shreveport Transit Mgmt. Inc., 226 F.3d 394, 298 (5th Cir. 2000) (quoting Threadgill, 145 F.3d at 292; Jones v. Ga. Pac. Corp., 90 F.3d 114, 116 (5th Cir. 1996); Walker v. Wal-Mart Stores, Inc., 159 F.3d 938, 940 (5th Cir. 1998) (per curiam)).

, but exclusive of . . . income arising from the exercise of a stock option . . . .[86]

The Fifth Amendment to the retirement plans provides,

> Pennzoil-Quaker State Company . . . , having established the Pennzoil-Quaker State Company Salaried Employees Retirement Plan, effective January 1, 1999, having amended and merged the Plan, effective January 1, 2001 and having again amended and merged and renamed said Plan as the Pennzoil-Quaker State Company Employees Retirement Plan (the "Plan"), effective January 1, 2002, and having reserved the right to amend the Plan, does hereby amend the Plan, effective March 1, 2002, as follows:
>
> 1. The Definition of "Change of Control" in Section 1.10 of the Salaried Employees Retirement Plan Document and in Section 1.7 of the Pension Plan Document for Salaried Employees are each hereby amended in their entirety to read as follows . . . .
>
> 2. The definitions of "Considered Compensation" in Section 1.11 of the Salaried Employees Retirement Plan Document and in Section 1.11 of the Pension Plan Document for Salaried Employees are each hereby amended in their entirety to read as follows:
>
> 1.11 <u>Considered Compensation</u>: The compensation actually paid to a Member (excluding a Transferred Member) . . . by his Employer for personal services, including normal salary, wages, commissions, overtime pay, severance pay . . . vacation pay, pay in lieu of vacation, bonuses . . . , amounts distributed under any unfunded plan of deferred compensation . . . and income arising from the exercise or cash-out of a stock option . . . .[87]
>
> 3. Section 2.3 of the Salaried Employees Plan Document is hereby amended, effective January 1, 2002, by adding a subsection (j)

---

[86] Emphasis added.

[87] Emphasis added.

> thereto to read as follows: "Credit Union Employees: Pursuant to a merger of the First Energy Credit Union . . . and the Houston Energy Credit Union, the Credit Union withdraws participation in the Plan on behalf of its employees . . .

Defendants' reading of this language to mean that as of March 1, 2002, the amendment would apply "prospectively only to income received by an employee arising" from the exercise of a stock option "on or after March 1, 2002," is a fair reading of the amendment. As the district court found, "Before the enactment of the Fifth Amendment, wages and salaries had always been included within Considered Compensation. . . . [R]ather than limiting any such income accrued before the effective date, the Fifth Amendment simply added a new form of income, namely that realized from the exercise of a stock option, on or after the amendment's effective date."[88] Plaintiffs urge that "the plain language of the Fifth Amendment has no date qualifier" – that "unlike subsections one and two, subsection three specified its own effective date (January 1, 2002), and that language it added contained a date qualifier." They maintain that this, combined with the fact that the "Ninth Amendment's replacement definition of 'Considered Compensation' contained date qualifying language; specifically, 'income arising from the exercise or cash-out of a stock option prior to March 1, 2003 . . . ,'" means that the plan plainly failed to include an effective date for the new definition of Considered Compensation. To the contrary, a fair reading of the plain language shows that the effective date for sections 1 and 2 of the Fifth Amendment is March 1, 2002 – as shown by the language "effective March 1, 2002, as follows" directly preceding sections 1 and 2 – and that the effective date for section 3 is January 1, 2002. Finally, Siegel urges that

---

[88] Crowell, 481 F.Supp. 2d at 812.

35

the Fifth Amendment "entirely" replaced the previous definition of 'Considered Compensation,' and because the replacement was made effective as of March 1, 2002, the Fifth Amendment's definition of 'Considered Compensation' was the only definition of 'Considered Compensation' in existence at the time Siegel's lump-sum change in control payout became due on October 1, 2002.

Because we find that Defendants' determination that the Fifth Amendment's definition of Considered Compensation applied only to income earned from the exercise of stock options on or after March 1, 2002, is a fair reading of the plan language, this argument is not persuasive. Even if the Fifth Amendment's definition of Considered Compensation is the only definition that applied in October 2002, that new definition did not include income from the exercise of stock options in 1997.

> Under the third prong of the "legally correct" test,
>
> in reviewing the correctness of the . . . interpretation, we must determine whether either of the interpretations would give rise to "substantial unanticipated costs to the Plan." If a given interpretation would result in such costs, that interpretation is less likely to be legally correct.[89]

Plaintiffs urge that "Crowell's interpretation presents no material unanticipated costs," as Pennzoil had "at least four weeks from the time Appellants first raised the stock option income issue" and "the $500,000 figure . . . is only a possible payout in the distant future, assuming all impacted employees were to stay and that no future Amendments would revise the definition." Defendants urge that they "never anticipated that the Fifth Amendment would sweep all pre-March

---

[89] Batchelor, 877 F.2d at 445 (quoting Lowry v. Bankers Life & Cas. Retirement Plan, 865 F.2d 692, 695 (5th Cir. 1989)).

1, 2002 income from option exercises into Considered Compensation" and that "acceptance of Appellants' interpretation of the Fifth Amendment could result in the assumption of significant unanticipated costs." Both of these arguments somewhat miss the mark. The question of "unanticipated" costs is more accurately approached as an inquiry into the plain reading of the plan language and whether a proposed alternate reading would result in costs unanticipated under the plain meaning.[90] In that respect, costs arising from benefits awarded for the 1997 exercise of stock options would be unanticipated in light of our de novo review of a fair reading of the plan. However, the term "unanticipated" to some extent requires an inquiry into how the administrator interpreted the plan – an inquiry that is in this case inherently intertwined with the "plain language" of the plan – and whether the alternate interpretation would lead to costs unanticipated by the administrator.[91] If, for example, an administrator had been interpreting the plan contrary to its plain language, and an alternate interpretation using a fair reading of the plan's plain language suggested that more benefits were due, that alternate interpretation would result in costs that were not subjectively anticipated by the employer but should have been objectively anticipated. As such, an alternate interpretation under a fair reading would not result in unanticipated costs. In that respect, the parties' arguments are relevant.

---

[90] See, e.g., Ellis v. Liberty Life Assur. Co. of Boston, 394 F.3d 262, 272 (5th Cir. 2004) (finding that unanticipated costs would be incurred where an alternate reading of the plan would lead to an "absurd result" and would render a phrase "meaningless surplusage").

[91] See, e.g., Atteberry v. Mem'l-Hermann Healthcare Sys., 405 F.3d 344, 349 (5th Cir. 2005) (finding that "a different interpretation of the . . . [plan] than the one adopted by the Administrative Committee would result in unanticipated costs").

Two e-mails, viewed in the light most favorable to Plaintiffs, show that at least one employee may have temporarily followed Plaintiffs' interpretation of the plan. The record evidence shows that an outside attorney wrote an e-mail to Linda Condit, a Pennzoil employee, stating that "in reviewing the retirement plan definition of compensation and the amendment, I determined that nothing has actually changed. Options, conditional stock etc., etc. has always been included." Condit interpreted this e-mail to mean that "Laura confirmed that their opinion is that the option exercises have been included all along (not just going back to March 1, 2002). The amendment to the plan will clarify this." The outside attorney later explained, according to the plan administrator, that "[w]hen she was referring to compensation changes being effective prior to March 1, 2002, she was referring to changes made by the Second Amendment to the plan." Other record evidence shows that Defendants never included the exercise of 1997 stock options in their calculations of benefit costs. When it hired Mercer to do a cost analysis of benefits, Mercer did not include income from the 1997 exercise of stock options in its calculations. Nor did Shell's computer program for calculating benefits include this income. The unanticipated costs inquiry does not definitively weigh in either party's favor. And under the most relevant inquiry – which is not whether the Defendants subjectively anticipated costs but whether they should have objectively anticipated costs under the plan's plain language – Plaintiffs' alternative interpretation results in unanticipated costs.

Even if the two e-mails were sufficient to raise a fact issue as to unanticipated costs, the district court did not err in holding that the administrator's interpretation of the plan was legally correct, as there is ample record evidence to support the district court's conclusions that the

administrator's interpretation was a "fair reading" of the plan and that the administrator uniformly applied the plan.[92] Nor do are we convinced that the district court's failure to find a conflict of interest merits reversal, as the conflict of interest is not a "tiebreaking"[93] factor here. Given the evidence that the administrator's reading was a fair one, and a lack of evidence of a non-uniform application of the Fifth Amendment to income from the exercise of 1997 stock options, this is not a case where the "factors are closely balanced."[94] It is also not a case "where circumstances suggest a higher likelihood that . . . [the conflict of interest] affected the benefits decision," as Plaintiffs have not argued in their brief, nor pointed us to evidence, of, for example, "a history of biased claims administration" or other factors suggesting a greater risk of a conflict of interest in this benefits decision.[95]

Finally, Plaintiffs urge without citation to the record that, the three-step inquiry aside, Defendants abused their discretion by acting in bad faith – that they "pretend[ed] that ERISA applied to the Agreement and then put Crowell through a charade of fake considerations and hearings that were completely

---

[92] Cf. Gosselink, 272 F.3d at 727 (observing that "[t]he most important factor to consider [is] whether the administrator's interpretation is consistent with a fair reading of the plan"); Pickrom, 57 F.3d at 471-72 (affirming a district court's finding of no abuse of discretion based only on the "fair reading" term, where there was no record evidence on unanticipated costs or uniform construction).

[93] Metro. Life, 128 S.Ct. at 2351.

[94] Id.

[95] Id.; see also MacLachlan, 350 F.3d at 479 ("The degree to which a court must abrogate its deference to the administrator depends on the extent to which the challenging party has succeeded in substantiating its claim that there is a conflict." (internal citations omitted)). Although the Plaintiffs crossed the Metropolitan Life threshold for a conflict of interest claim, they failed to further substantiate that claim.

unauthorized and beyond Lang's [the plan administrator's] authority at the time." They also maintain, without record citation, that Catherine Lamboley, Shell's Senior Vice President, General Counsel and Corporate Secretary,[96] "simply refused to acknowledge any of Crowell's requests for resolution."

> Clearly, if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations.[97]

Although Plaintiffs describe in detail why they believe that administrators misinterpreted the plan language, they do not point to evidence in the record sufficient to support allegations of bad faith.[98]

AFFIRMED.

---

[96] Crowell alleged in his original complaint in state court that he "sought to resolve the dispute by corresponding with Lang, the Plan Administrator and Vice-President of Human Resources and Services," that he "also sought to resolve the dispute by corresponding with Lamboley," and that "Lang and Lamboley acted as agents for Pennzoil and/or Shell throughout the course of Crowell's attempts at resolution of this dispute."

[97] Gosselink, 272 F.3d at 727.

[98] Plaintiffs urge that Defendants changed the Fifth Amendment's effective date to March 1, 2002, "specifically to benefit one person, Mark Esselman [Pennzoil's Senior Vice President of Human Resources], by capturing pre-announcement stock option exercises." They do not provide a record citation for this claim.