# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 27, 2013

No. 12-20294

Lyle W. Cayce
Clerk

CAROL A. CANTRELL,

Plaintiff – Appellant

v.

BRIGGS & VESELKA COMPANY, A Professional Corporation,

Defendant – Third Party Plaintiff – Appellee

v.

CANTRELL & COWAN, P.L.L.C.,

Third Party Defendant – Appellant

-------------------------------------------------------------------------------------------------------

W. PATRICK CANTRELL,

Plaintiff – Appellant

v.

BRIGGS & VESELKA COMPANY; A Professional Corporation,

Defendant – Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, GARZA, and OWEN, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

No. 12-20294

This case arises out of an employment dispute between Carol and Patrick Cantrell and their former employer, Briggs & Veselka Company ("B&V"). The district court held the Cantrells' deferred compensation arrangements in their Employment Agreement contracts with B&V constitute a plan under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* We REVERSE and REMAND with instructions to remand to the state court.

**I**

The Cantrells owned a CPA firm, P. Cantrell & Company, P.C., which they combined with B&V in 2000 in a tax-free merger, with the merged entity retaining the Briggs & Veselka name. The original B&V shareholders received approximately 80% of the shares of the merged entity, and the Cantrells received approximately 20%.

As part of the merger, the Cantrells executed Stock Redemption Agreement and Employment Agreement contracts with B&V. The Stock Redemption Agreement provides for redemption of the Cantrells' stock upon the occurrence of death, long-term disability, resignation or other termination of employment, disposition of the shares to a third party, or divorce. The redemption price is calculated using the cash-basis book value of the combined entity. When apportioning the shares during the merger, B&V was valued at $4.9 million and P. Cantrell & Company was valued at $1.2 million, though the redemption value of the Cantrells' stock was only about $57,000.

The Employment Agreements outline the terms and scope of the Cantrells' employment with B&V, describe the Cantrells' compensation and benefits packages, and contain noncompete and nondisclosure clauses. The identical noncompete clauses prohibit the Cantrells from competing with B&V by participating in any entity engaged in the same business as B&V within fifty miles of B&V's location during the period of employment and for one year following the termination of employment. The clauses also prohibit the

No. 12-20294

Cantrells from soliciting B&V clients or disclosing B&V's confidential information during the same period.

In addition, the Employment Agreements provide for deferred compensation, the focus of this litigation. The relevant paragraphs state:

> **6.1 Deferred Compensation.** Upon occurrence of the Termination Event, the EMPLOYER agrees to pay the EMPLOYEE the Deferred Compensation Amount in forty (40) equal installments (the "Installment Amount"), payable on the fifteenth of the month following the end of each calendar quarter during the Pay-Out Period; *provided, however,* in no event may the EMPLOYER'S Aggregate Quarterly Deferred Compensation Payment in any quarter exceed twenty five percent (25%) of the EMPLOYER'S Adjusted Net Profit for the previous fiscal year ended September 30 divided by four (4) (the "Limitation Amount"). If the Aggregate Quarterly Deferred Compensation Payment for any quarter would exceed the Limitation Amount, the EMPLOYEE'S Installment Amount shall be reduced to an amount equal to her proportionate share of the EMPLOYER'S Aggregate Quarterly Deferred Compensation Payment for such quarter times the Limitation Amount. In the event the EMPLOYEE'S Installment Amount is reduced by application of previous sentence, such reduced amount shall be added to the EMPLOYEE'S Installment Amount due in subsequent quarters until paid, provided that each subsequent quarter's payment will also be subject to the Limitation Amount.

> **6.2 Termination Event.** The Termination Event shall be the first of the following events to occur:

> (a) The Retirement of the EMPLOYEE;

> (b) The Disability of the EMPLOYEE while employed;

> (c) The death of the EMPLOYEE while employed; or

> (d) The termination of the EMPLOYEE'S employment with the EMPLOYER by a majority vote of the Board of Directors for any reason other than With Cause.

> **6.3 Deferred Compensation Amount.** The Deferred Compensation Amount shall be equal to the product of four (4) times the EMPLOYEE'S Average Compensation multiplied by her Vested Percentage. The EMPLOYEE'S Vested Percentage and Average

Compensation shall be determined as of the date of the Termination Event and shall not be affected by the subsequent occurrence of the other events listed in Section 6.2. After serving twenty (20) years of Creditable Service, the EMPLOYEE'S Vested Percentage shall be eighty percent (80%), and her Vested Percentage shall increase an additional ten percent (10%) for each of the following two (2) years at which time the EMPLOYEE'S Vested Percentage shall be one hundred percent (100%). However, if during the Period of Employment the EMPLOYEE dies or incurs a Disability, the EMPLOYEE'S Vested Percentage shall immediately become one hundred percent (100%).

**6.4 Pay-Out Period.** The Pay-Out period shall begin on the fifteenth day of the month following the end of the calendar quarter in which the Termination Event occurs and shall end ten (10) years later; provided, however, in the event there is any remaining balance on the Deferred Compensation Amount due at the end of the Pay-Out Period, the Pay-Out Period shall continue until such balance is paid, subject to the limitations contained in Section 6.1, and such remaining balance shall be treated as if it were the EMPLOYEE'S Installment Amount.

. . . .

**6.7 Forfeiture Upon Competing With the EMPLOYER or Terminated With Cause.** If during the Pay-Out Period the EMPLOYEE competes . . . with the EMPLOYER . . . within fifty (50) miles . . . the EMPLOYEE forfeits all remaining balance of the Deferred Compensation Amount outstanding as of the date he begins engaging in such competition, and the EMPLOYER is relieved of its obligation to make future payments to the EMPLOYEE under this Article . . . . Furthermore, if the EMPLOYEE is terminated With Cause . . . the EMPLOYEE forfeits all rights he may otherwise have under this Article . . . .

Under their respective agreements, Carol received ten and Patrick received thirteen years of "Creditable Service" for Vested Percentage purposes.

At the time of the merger, the other seven B&V employee-shareholders also entered into employment agreements with B&V, and eight additional employee-shareholders have since entered into similar agreements. Thus, a total of seventeen current and former B&V employee-shareholders have deferred

compensation arrangements.  When the nine original employees entered into their agreements, B&V notified the Department of Labor it had nine separate ERISA plans, each involving one employee.

The agreements of the other employee-shareholders contain deferred compensation arrangements similar to those in the Cantrells' agreements.  The primary difference in the Cantrells' agreements is in the calculation of the vested percentages.[1]  Additionally, the Cantrells' agreements, along with that of one other employee, calculate the Limitation Amount based on 25% of net profit, while the remaining agreements calculate the Limitation Amount based on 5% of gross revenue.[2]

Patrick retired from B&V in December 2007 and began practicing law.  Due to the thirteen years of credit he received at the time of the merger and the seven years he worked at B&V, he met the twenty-year vesting requirement, and B&V began paying his deferred compensation in January 2008.  Carol remained employed at B&V, and in May 2011 she formed a law firm, Cantrell & Cowan, P.L.L.C. ("C&C") with Patrick and another partner.

On November 11, 2011, Carol gave B&V notice of her retirement, effective January 15, 2012.  Due to the ten years of credit she received at the time of the merger and the approximately eleven years she worked at B&V, she expected to meet the twenty-year vesting requirement.  B&V then received a copy of a C&C invoice and payment for C&C services from a B&V client.  Based on this invoice

---

[1] *Compare* Cantrells' Employment Agreements (providing vested percentage would be 80% after twenty years creditable service and would increase by 10% in each of following two years), *with* Remaining Employment Agreements ("After four (4) years of Creditable Service, the EMPLOYEE'S Vested Percentage shall be twenty percent (20%).  The EMPLOYEE shall vest at five percent (5%) a year thereafter up to twenty years of Creditable Service; *provided, however,* the EMPLOYEE shall be subject to a percentage reduction of five percent (5%) a year prior to age 55, four percent (4%) a year prior to age 60, and three percent a year (3%) prior to age 65.").

[2] Some originally used 25% of net profit, but they renegotiated their contracts in 2008.  Patrick was already receiving benefits in 2008, and Carol refused to renegotiate.

and some of Carol's emails from her B&V email account, B&V sent Carol a letter on January 3 notifying her that she may be in breach of her Employment Agreement and requesting a meeting to discuss a possible resolution. Carol then notified B&V of an accelerated retirement date of January 3. On January 13, B&V rejected Carol's accelerated retirement and terminated Carol "with cause" for allegedly violating the noncompete clause in her Employment Agreement. Because she was terminated with cause, B&V determined Carol forfeited her deferred compensation and did not make any payments. B&V also stopped its quarterly payments to Patrick in January 2011 and notified him that he forfeited the remainder of his deferred compensation on the grounds that he was competing with B&V in his work at C&C.

The Cantrells filed separate lawsuits against B&V in Texas state court, seeking the deferred compensation payments. B&V removed both lawsuits to federal court on the grounds that the deferred compensation payments in the Employment Agreements constituted an ERISA plan, preempting the Cantrells' state law claims. The district court consolidated the lawsuits, B&V filed a number of counterclaims against the Cantrells, and B&V moved for a temporary restraining order ("TRO"). The district court granted the TRO, prohibiting Carol from disclosing or using any information learned while at B&V and from soliciting or working for B&V clients. The Cantrells moved to remand the consolidated lawsuit back to Texas state court. The district court denied the Cantrells' motion to remand, holding the deferred compensation arrangements were an employment benefit plan under ERISA, and declined to certify the issue for interlocutory appeal. The Cantrells filed an emergency motion with this court to stay the TRO pending appeal, and this court granted the motion. *See* Order, *Cantrell v. Briggs & Veselka Co.*, No. 12-20172 (5th Cir. Mar. 21, 2012). The parties then entered into an agreed temporary injunction, in which the Cantrells agreed to refrain from certain activities related to B&V's former or

No. 12-20294

current clients, contingent on the district court's grant of permission to seek an interlocutory appeal of its denial of the motion to remand. The district court granted permission, and this appeal followed.

We review the district court's denial of the Cantrells' motion to remand de novo. *Woods v. Tex. Aggregates, L.L.C.*, 459 F.3d 600, 601 (5th Cir. 2006).

## II

The Cantrells assert the federal courts lack subject matter jurisdiction because the deferred compensation arrangements in their Employment Agreement contracts with B&V do not constitute an ERISA plan. B&V counters the federal courts do have subject matter jurisdiction because the arrangements do constitute an ERISA plan.

ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1002(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a). To determine whether a particular employee benefit qualifies as an employee benefit plan under ERISA, we have devised a three-part test in *Meredith v. Time Insurance Company*: "[W]e ask whether a plan: (1) exists; (2) falls within the safe-harbor provision established by the Department of Labor; and (3) satisfies the primary elements of an ERISA 'employee benefit plan'—establishment or maintenance by an employer intending to benefit employees." 980 F.2d 352, 355 (5th Cir. 1993). Because we hold the deferred compensation arrangements in the Cantrells' Employment Agreements do not make out the existence of a plan, they do not pass the first part of the test and we need not reach the second and third parts. Whether a plan exists is fact-specific, so we proceed to explain the case-law backdrop of the inquiry.

In its seminal decision laying out the requirements for the existence of ERISA plans, *Fort Halifax Packing Company, Inc. v. Coyne*, the Supreme Court held that in order to constitute an ERISA plan, a program must necessitate the

existence of "an ongoing administrative program to meet the employer's obligation."  482 U.S. 1, 11 (1987).  In that case, a Maine statute required employers to make a one-time severance payment to employees working at a plant in the event the plant closes.  *Id.* at 3.  Because "[t]he requirement of a one-time, lump-sum payment triggered by a single event" did not require the employer to set up "an administrative scheme to meet its contingent statutory obligation," the Court held the Maine statute was not preempted by ERISA.  *Id.* at 12, 14–15.

In *Tinoco v. Marine Chartering Company, Inc.*, we applied *Fort Halifax* to an arrangement for payment to two employees intended to cover health care benefits until the employees became eligible for social security benefits.  311 F.3d 617, 618–19 (5th Cir. 2002).  Upon the employer's merger with another company, the payments became explicit severance payments due upon retirement or termination, and the employees could elect to receive either a lump-sum payment or a stream of payments.  *Id.* at 619, 622.  We explained:

> Regardless of how Appellees chose to receive those payments, the total amount to be paid was based on a one-time calculation using a fixed formula.  Under the formula, age (which must have been a minimum of 55) is added to the number of years of service (which must have been at least 15 years).  Appellees then received a percentage of what they would normally receive in Social Security based on the total number arrived at through the above calculation.  Significantly, Appellees provide no evidence that the ERHCP requires an administrative scheme to make ongoing discretionary decisions based on subjective criteria.  And, as this Court held in *Fontenot* [*v. NL Industries, Inc.*, 953 F.2d 960, 961 (5th Cir. 1992)], simply because Marine Chartering offered Appellees the option of receiving that payment over a period of time does not mean that the ERHCP amounts to an administrative scheme.

*Tinoco*, 311 F.3d at 622.  Concluding that "writing a check each month is hardly an administrative scheme," we held the severance payments at issue did not constitute an ERISA plan.  *Id.* at 623.

No. 12-20294

We then held in *Peace v. American General Life Insurance Company* that an employer's one-time payment into an annuity, which was then transferred to an employee for retirement payments, did not constitute an ERISA plan. 462 F.3d 437, 441 (5th Cir. 2006). After the employer's payment "there was no subsequent demand on its assets," the event triggering payment may never have materialized, and "the pre-determined benefit, even when paid over time, did not amount to an administrative scheme." *Id.* (citing *Tinoco*, 311 F.3d at 618–19, 622). Significantly, we rejected the employer's assertions that it theoretically could have made various discretionary decisions, as it was the owner of the annuity for a brief amount of time, because no administrative scheme was *required*. *Id.* at 462 F.3d at 441–42 ("[T]he fact that [the employer] could have developed an unnecessary administrative scheme or performed unnecessary, ongoing administrative tasks is irrelevant to our analysis.").

This circuit has often cited the Ninth Circuit's decision in *Bogue v. Ampex Corporation*, 976 F.2d 1319 (9th Cir. 1992) (Wisdom, J., sitting by designation). *See, e.g.*, *Peace*, 462 F.3d at 440 n.6; *Tinoco*, 311 F.3d at 621. *Bogue* involved a program whereby an employer would provide certain executives severance benefits in the event the employees were not offered "substantially equivalent employment" once the employer was sold to another company. *Bogue*, 976 F.2d at 1321. The program designated the buying company as the entity that would determine whether the employment offered to any given executive was substantially equivalent to the position the executive previously held. *Id.* Even though the plan was triggered by a single event, that event "would occur more than once, at a different time for each employee," "the program's administration required a case-by-case, discretionary application of its terms," and "there was no way to administer the program without an administrative scheme." *Id.* at 1323. Accordingly, *Bogue* held an ERISA plan existed. *Id.*

9

No. 12-20294

The Ninth Circuit later clarified *Bogue*'s requirement of discretion in a case where severance benefits depended on whether the employee was terminated "for cause":

> Here, as in *Delaye* [*v. Agripac, Inc.*, 39 F.3d 235 (9th Cir. 1994)], the employer was simply required to make a single arithmetical calculation to determine the amount of the severance benefits. While in both cases, a "for cause" termination would change the benefits due to the employee, the *Delaye* court did not deem this minimal quantum of discretion sufficient to turn a severance agreement into an ERISA plan.  Contrary to PACE's assertions, the key to our holding in *Bogue* was that there was "*enough* ongoing, particularized, administrative discretionary analysis," 976 F.2d at 1323 (emphasis added), to make the plan an "ongoing administrative scheme," not that the agreement simply required some modicum of discretion. The level of discretion, if any, which PACE was required to exercise in implementing the agreement was slight.  It failed to rise to the level of ongoing particularized discretion required to transform a simple severance agreement into an ERISA employee benefits plan.

*Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1316 (9th Cir. 1997).

In *Crowell v. Shell Oil Company*, we considered "Letters of Agreement" that required an employer to make a one-time payment to two employees for "the amount of pension and savings money they would lose as a result of certain tax regulations" following a change of control at the employer, as well as monthly pension payments to offset reductions in benefits resulting from tax regulations. 541 F.3d 295, 299 (5th Cir. 2008).  Only the one-time payment was at issue. *Id.* at 298.  We held the letters were distinguishable from the payment required in *Fort Halifax* because the one-time payment was "embedded within a letter that includes a more comprehensive 'plan,'" requiring monthly pension payments for life, and because calculating the monthly pensions and one-time payment relied on calculations made in the employer's separate underlying employee benefit

plans. *Id*. at 305. In addition, the letters explicitly referenced "administrative procedures" used in the letters and in the separate benefit plans. *Id*. We held:

> Although the individual cash payment in this case does not itself require continuing administration, the letter of which it is a part contains other provisions that do. . . . [T]he cash payment . . . relies upon calculations made under plans that require continuing administration, and that Letter of Agreement refers specifically to administrative procedures that must be followed.

*Id*. at 306. Accordingly, the letters constituted an ERISA plan. *Id*. at 307.

Against this backdrop, we hold the Cantrells' deferred compensation arrangements in their Employment Agreements with B&V do not constitute an ERISA plan, but rather are employment contract arrangements governed by state law. There is no necessity for "an ongoing administrative program to meet the employer's obligation" to provide deferred compensation. *Fort Halifax*, 482 U.S. at 11. Like the arrangement in *Tinoco*, the amount of deferred compensation B&V is to pay the Cantrells is "based on a one-time calculation using a fixed formula," and writing a check each quarter "is hardly an administrative scheme." *Tinoco*, 311 F.3d at 622. In other words, "the pre-determined benefit, even when paid over time, [does] not amount to an administrative scheme." *Peace*, 462 F.3d at 441.

Unlike the compensation arrangement at issue in *Bogue*, the Cantrells' deferred compensation arrangements neither involve discretionary decisions, such as deciding whether an employment offer is for "substantially equivalent employment," nor explicitly give the employer, B&V, authority to make such discretionary decisions.[3] *Cf. Bogue*, 976 F.2d at 1321. And unlike in *Crowell*, the amount and duration of payments here is fixed, the amount due does not depend

---

[3] The only two mentions of the word "discretion" in the deferred compensation section of Carol's Employment Agreement occurs in the paragraphs governing severance payment in the event of termination without cause and payment upon death, and only gives B&V the discretion to make those payments as a lump sum instead of as installments.

on decisions made in underlying ERISA plans, and the deferred compensation agreements do not reference administrative procedures that must be followed. *Cf. Crowell*, 541 F.3d at 305–306.

B&V asserts it must perform ongoing discretionary actions and complex calculations because the compensation formula caps the total amount of payments each quarter, it must 'monitor' its former employees to ensure they do not compete against B&V during the pay-out period, and it must use discretion to determine whether a triggering event occurred.

First, the possibility the cap would ever be triggered is remote. Internal B&V documents, assuming a normal growth rate, show the cap would never be reached. Even if it were triggered, there is nothing discretionary or complex about reducing each payee's amount proportionally and adding the reduction to future payments. Even if the precise amount to be added to each future payment involves a "modicum of discretion," it is simply not "*enough* ongoing, particularized, administrative discretionary analysis" to constitute an administrative scheme as it involves very little discretion, if any at all (presumably the full amount should be added as soon as possible to future payment, subject to the cap). *Velarde*, 105 F.3d at 1316 (quoting *Bogue*, 976 F.2d at 1323). And again, it is unlikely the cap will ever be triggered. Though we recognize our precedents did not directly address the existence of a cap that may modify the exact disbursement of payments, we do not agree with B&V that the remote possibility of minor payment redistribution over the payment period requires such a level of discretion or complex calculations that an ongoing administrative scheme is necessary, especially where the "total amount to be paid [is] based on a one-time calculation using a fixed formula." *Tinoco*, 311 F.3d at 622.[4]

---

[4] The dissent reasons an administrative scheme is necessary because "unless and until B&V makes the calculation, at least annually, it cannot be determined if the cap is to be

No. 12-20294

Second, B&V's use of Patrick Cantrell's situation as evidence that it must 'monitor' payees illustrates there is no administrative scheme set up. B&V discontinued Patrick's payments after discovering Carol's C&C document in B&V's office, not as a result of any 'monitoring' on B&V's part. Nor does B&V explain what such 'monitoring' would constitute or how it would require an ongoing administrative scheme. Just as we rejected the assertion of the employer in *Peace* that it could have set up a hypothetical administrative scheme to ensure its former employee continually received checks from his annuity, *Peace*, 462 at 441–42, we reject B&V's assertion that it needs a hypothetical administrative scheme to 'monitor' its former employees.

Third, though the triggering events here are like the one at issue in *Bogue* in that they "would occur more than once, at a different time for each employee," *Bogue*, 976 F.2d at 1323, and different from the ones in *Fort Halifax* and *Peace*, where the triggering event may never occur, *Fort Halifax*, 482 U.S. at 12, *Peace*, 462 F.3d at 441, they simply do not require more than a "modicum of discretion," *Velarde*, 105 F.3d at 1316 (construing *Bogue*, 976 F.2d at 1323), as they can be easily ascertained. The employee must retire, become disabled, die, or be terminated on grounds other than with cause. Though B&V asserts it used discretion to determine whether Carol was terminated "with cause," we reject the notion that this is enough to necessitate an ongoing administrative scheme. *See Velarde*, 105 F.3d at 1316 ("While . . . a 'for cause' termination would change the benefits due to the employee, . . . this minimal quantum of discretion [is not] sufficient to turn a severance agreement into an ERISA plan."). Even less

---

applied." *Post* at 4. This reasoning would allow a company to transform an employment contract into an ERISA plan simply by including a hypothetical cap, no matter how unlikely it is to ever be reached. Here, the only evidence in the record regarding the likelihood of reaching the cap was generated by B&V and indicates the cap is unlikely to ever be reached. The inclusion of this cap simply does not necessitate "*enough* ongoing, particularized, administrative discretionary analysis" to constitute an administrative scheme. *See Velarde*, 105 F.3d at 1316 (quoting *Bogue*, 976 F.2d at 1323).

plausible is B&V's assertion that it had to use enough discretion to justify an ongoing administrative scheme when it decided Patrick's retirement constituted a "retirement" triggering event. *Cf. Clayton v. ConocoPhillips Co.*, No. 12-20102, 2013 WL 3357574, at *1 n.2, 13 (5th Cir. July 3, 2013) (forthcoming publication) (holding discretion exists where plan administrator must decide whether employee resignation was result of "a substantial reduction of the [employee]'s position or responsibilities").

Because the Cantrells' deferred compensation arrangements do not necessitate an ongoing administrative scheme, there is no ERISA plan. Accordingly, the Cantrells' state law claims are not preempted by ERISA. "Where federal subject matter jurisdiction is based on ERISA, but the evidence fails to establish the existence of an ERISA plan, the claim must be dismissed for lack of subject matter jurisdiction." *Tinoco*, 311 F.3d at 623 (quoting *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir. 1994)).

## III

For the foregoing reasons, we REVERSE and REMAND with instructions to remand to the state court.

No. 12-20294

OWEN, Circuit Judge, dissenting:

I would affirm the district court's judgment and hold that the deferred-compensation provisions in the Cantrells' Employment Agreements constitute an ERISA plan.

Based on the Supreme Court's reasoning in its seminal decision in *Fort Halifax Packing Co. v. Coyne*,[1] as well as decisions from the Fifth Circuit, the Cantrells' deferred-compensation plan is an ERISA plan. In *Fort Halifax*, the Supreme Court held that a Maine statute requiring "a one-time, lump-sum payment triggered by a single event" was not preempted by ERISA because it "require[d] no administrative scheme."[2] The Court emphasized that the Maine statute did not require employers to pay benefits on a regular basis, did not place periodic demands on employers' assets, and was contingent on a single event that might never occur.[3] The Court subsequently described *Fort Halifax* as "constru[ing] the word 'plan' to connote some *minimal*, ongoing 'administrative' scheme or practice."[4] Relying on *Fort Halifax*, this court has held that benefits are governed by ERISA when they require management to make "case-by-case determinations";[5] the employer cannot carry out its obligations "with . . . unthinking, one-time, nondiscretionary application of the plan"[6] and therefore

---

[1] 482 U.S. 1 (1987).

[2] *Fort Halifax*, 482 U.S. at 12.

[3] *Id.*

[4] *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.2 (1992) (emphasis added).

[5] *Tinoco v. Marine Chartering Co.*, 311 F.3d 617, 621 (5th Cir. 2002) (citing *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992)).

[6] *Id.* (quoting *Bogue*, 976 F.2d at 1323) (internal quotation marks omitted).

15

No. 12-20294

must "make ongoing discretionary decisions based on subjective criteria";[7] and the benefits create an ongoing demand on the employer's assets.[8] The deferred-compensation provisions of the Employment Agreements have these attributes.

For the Cantrells, there is a cap on the aggregate quarterly deferred-compensation benefits that are to be paid by B&V, which is 25% of B&V's adjusted net profit for the previous fiscal year.[9] For fifteen other employees, the cap is calculated differently.[10] B&V must at least annually calculate the cap under the Cantrells' agreements and the cap under the other agreements and to compare those caps to the aggregate quarterly payment. If additional employees become eligible to receive benefits during a particular quarter, B&V must repeat the comparison using the revised aggregate quarterly payment amount. If one of the caps is triggered, B&V is required to reduce the quarterly payments for the affected employees. If there are reductions in payments, there is a provision

---

[7] *Id.* at 622; *see also Crowell v. Shell Oil Co.*, 541 F.3d 295, 307 (5th Cir. 2008) (rejecting the plaintiffs' contention that a deferred-compensation scheme was not an ERISA plan because it "provided no opportunity for any exercise of discretion regarding the determination of whether an employee would receive compensation . . . or how much compensation would be received" and noting that the plaintiffs failed "to recognize the discretion required in making benefits determinations under several portions" of the compensation scheme, including various calculations of monthly amounts owed and tax limitations); *Fontenot v. NL Indus., Inc.*, 953 F.2d 960, 963 (5th Cir. 1992) (noting that a severance plan might fall under ERISA if "the circumstances of each employee's termination [had to be] analyzed in light of [certain] criteria" but that no administrative scheme is required if the employees "receive benefits upon termination regardless of the reason for termination" (alterations in original) (quoting *Pane v. RCA Corp.*, 667 F. Supp. 168, 171 (D.N.J. 1987)) (internal quotation marks omitted)).

[8] *See Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 441 (5th Cir. 2006) (holding that benefits were not part of an ERISA plan in part because the employer "made a one-time payment into an annuity, after which there was no subsequent demand on its assets").

[9] Under the Cantrells' Employment Agreements, "in no event may [B&V's] Aggregate Quarterly Deferred Compensation Payment in any quarter exceed twenty five percent (25%) of [B&V's] Adjusted Net Profit for the previous fiscal year . . . divided by four (4)."

[10] The Employment Agreements of the fifteen other employees provide that "in no event may [B&V's] Aggregate Quarterly Deferred Compensation Payments exceed 5% of gross revenue on a cash basis of accounting for the previous fiscal year."

16

for carrying forward these amounts and paying them at a later date.[11] These are not uncomplicated calculations, and the caps require B&V to perform repeated calculations and to monitor aggregate benefit payments.

B&V must also make a number of discretionary decisions under the deferred-compensation agreements, including decisions about whether an employee has forfeited her benefits by being terminated with cause or by competing with B&V.[12] Another hallmark of an ERISA plan is present in this case. Unlike the "one-time, lump-sum payment triggered by a single event" at issue in *Fort Halifax*,[13] the deferred-compensation benefits owed to the Cantrells create an ongoing demand on B&V's general assets over a period of ten years. Benefit payments can be triggered by any one of a number of events, which are

---

[11] Both the Cantrells' agreements and the agreements of the other employees provide that

> If the Aggregate Quarterly Deferred Compensation Payment for any quarter would exceed the Limitation Amount the EMPLOYEE'S Installment Amount shall be reduced to an amount equal to her proportionate share of the EMPLOYER'S Aggregate Quarterly Deferred Compensation Payment for such quarter times the Limitation Amount. In the event the EMPLOYEE'S Installment Amount is reduced by application of previous sentence, such reduced amount shall be added to the EMPLOYEE'S Installment Amount due in subsequent quarters until paid, provided that each subsequent quarter's payment will also be subject to the Limitation Amount.

[12] The Employment Agreements provide
> If during the Pay-Out Period the EMPLOYEE competes, directly or indirectly, with the EMPLOYER . . . by engaging or participating in any business that is engaged in the EMPLOYER's or its Affiliate's business or proposed business within fifty (50) miles where the EMPLOYER or its Affiliate engages or proposes to engage in business at the time of the Termination Event, the EMPLOYEE forfeits all remaining balance of the Deferred Compensation Amount . . . . Furthermore, if the EMPLOYEE is terminated With Cause . . . the EMPLOYEE forfeits all rights [to deferred compensation under the agreement].

[13] *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987).

17

likely to occur at different times for individual employees.[14] The benefits require an "an ongoing administrative program" under *Fort Halifax* and under this court's precedent. Our court has held that ERISA governs benefits requiring less administration than the benefits in this case.[15]

The majority opinion concludes that the Cantrells' agreements require B&V to do nothing more than "writ[e] a check each quarter."[16] This assertion is not supported by the record. The majority opinion reasons that "the possibility the cap would ever be triggered is remote" and later opines that it is "unlikely" that the cap will be reached.[17] But that ignores the fact that unless and until B&V makes the calculation, at least annually, it cannot be determined if the cap is to be applied. The only evidence in the record to support the majority opinion's conclusion regarding the "remote[ness]" of the likelihood that the cap will limit payments is a draft presentation to shareholders that indicates that the cap "should never be reached assuming normal growth and therefore deferred compensation should be payable out of current profits." Here again,

---

[14] Under the Employment Agreements, employees become eligible for deferred-compensation payments after a qualifying Termination Event, i.e., retirement, disability, death of the employee during employment, or termination of the employee by a majority vote of B&V's board of directors.

[15] *See Perdue v. Burger King Corp.*, 7 F.3d 1251, 1253 & n.5 (5th Cir. 1993) (holding that the Burger King Job Elimination Program, which provided that employees terminated as a result of a reduction in workforce were entitled to receive certain severance benefits for three years, was an ERISA plan because it "was in effect for three years, applied to two nation-wide personnel reorganizations, and required an administrative set-up to monitor and facilitate provision of benefits" (internal quotation marks omitted)); *Whittemore v. Schlumberger Tech. Corp.*, 976 F.2d 922, 923 (5th Cir. 1992) (holding that "a provision of the company's management policy manual that . . . provided for severance pay in lieu of notice of termination" was an ERISA plan because it was "not created with a particular closing in mind," "had been in existence for some time," and "plainly required some sort of an administrative set-up in order to make payments to employees").

[16] *Ante* at 11.

[17] *Ante* at 12.

even were this true, the calculation must be performed to determine the applicability of the cap. Additionally, the draft of the presentation to the board, assuming it was accurate, is evidence only that the cap "should" not be reached *if B&V continues to grow normally*. Any number of events could affect B&V's growth over the payout period, and the aggregate quarterly payment will continue to increase as additional B&V employees become eligible to receive benefits. The majority opinion's conclusion that there is no ERISA plan relies, impermissibly, on the *prediction* that B&V will remain financially stable and will experience steady growth through the ten-year duration of the Cantrells' payments.

This is not only a prediction but an *irrelevant* prediction. The Employee Agreements plainly require administration even if B&V continues to grow normally. For example, B&V must monitor former employees to ensure that they are not competing with B&V during the payout period and, in the event of alleged competitive activity, to make discretionary decisions about whether the employee has forfeited benefits. The majority opinion concludes that B&V's handling of Patrick Cantrell's benefit payments—i.e., that B&V terminated Patrick's payments after its fortuitous discovery of Carol's C&C invoice and not because B&V independently monitored its employees—"illustrates that there is no administrative scheme set up."[18] But the inquiry under *Fort Halifax* is whether the disputed provisions "*require*[] an ongoing administrative program to meet the employer's obligation,"[19] not whether the employer has an adequate administrative scheme in place.

---

[18] *Ante* at 13.

[19] *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987) (emphasis added); *see also Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 441 (5th Cir. 2006) ("Halliburton was not required to create an administrative scheme to provide the annuity benefit.").

No. 12-20294

The majority opinion cites *Peace v. American General Life Insurance Co.*[20] to support its position, but in *Peace* the employer purchased a single-premium annuity and argued that "as owner of the annuity for a brief period of time, it *could* have made various discretionary decisions."[21] We rejected that assertion, holding that "it is insufficient to provide a benefit and then create an unnecessary administrative scheme around it to invoke ERISA."[22] This court emphasized in *Peace* that the activities performed by the employer were "performed only once or over a brief period of time and never performed again."[23] By contrast, B&V here maintains authority and control over the scheme; it has not relinquished its responsibility to make ongoing determinations regarding the Cantrells' benefits. The fact that B&V may not have yet "set up" competent monitoring procedures does not detract from the fact that such procedures are required to administer the benefits in accordance with the Cantrells' Employment Agreements.[24]

The majority opinion "reject[s] the notion" that the discretionary determination of whether an employee was terminated with cause "is enough to necessitate an ongoing administrative scheme."[25] However, this court recently held in *Clayton v. ConocoPhillips Co.*[26] that a severance arrangement that provided benefits to employees terminated after a change in corporate control

---

[20] 462 F.3d 437 (5th Cir. 2006).

[21] *Peace*, 462 F.3d at 441.

[22] *Id.*

[23] *Id.* at 440.

[24] *See Fort Halifax*, 482 U.S. at 11; *Peace*, 462 F.3d at 441.

[25] *Ante* at 13.

[26] No. 12-20102, 2013 WL 3357574 (5th Cir. July 3, 2013).

was an ERISA plan.[27]  Under the severance provisions, employees were eligible for benefits if they resigned for "Good Reason," which was defined in the provisions as any one of a number of events or conditions.[28]  An employee who was denied benefits under the severance provisions contended that the provisions were not an ERISA plan because they consisted of a "one-time, lump-sum payment triggered by a single event."[29]  Conoco contended that the provisions fell within ERISA because, inter alia, the trustee had to exercise discretion in determining whether "Good Reason" existed for a resignation.[30]  We agreed that this seemingly limited "claims eligibility discretion" necessitated an ongoing administrative program.[31]  Here, as in *Clayton*, B&V must determine whether a terminated employee was terminated "with cause."  There is no principled distinction between this "with cause" determination and the "Good Reason" determination at issue in *Clayton*.

The majority opinion cites *Velarde v. PACE Membership Warehouse, Inc.*,[32] in which the Ninth Circuit concluded that the "minimal quantum of discretion" involved in determining whether an employee was terminated for cause was insufficient to render severance benefits an ERISA plan.[33]  Even if we were to find *Velarde*'s reasoning persuasive, the Ninth Circuit in that case noted that "the employer was simply required to make a single arithmetical calculation to determine the amount of severance benefits" and concluded that the cause

---

[27] *Clayton*, 2013 WL 3357574, at *11-13.

[28] *Id.* at *1 & n.2.

[29] *Id.* at *12 (quoting *Fort Halifax*, 482 U.S. at 12) (internal quotation marks omitted).

[30] *Id.*

[31] *Id.* at *13.

[32] 105 F.3d 1313 (9th Cir. 1997).

[33] *Velarde*, 105 F.3d at 1317.

determination was not sufficient *by itself* to bring the benefits within the scope of ERISA.[34]    The cause determination, however, is only one feature of the deferred-compensation provisions that requires B&V to implement an administrative scheme.    B&V must also monitor employees for violations of their Employment Agreements and make forfeiture determinations when a violation occurs.    Additionally, as already discussed above, although the total amount of benefits to be paid is calculated only once, B&V is required to make yearly, and perhaps quarterly, computations to ensure compliance with the cap.    If the cap is triggered, B&V must decrease payments and recalculate the remaining installments.    This is more than the "single arithmetical calculation" contemplated in *Velarde*.    This case is therefore distinguishable from *Velarde*.

The Supreme Court has emphasized that ERISA requires "some minimal, ongoing 'administrative' scheme or practice."[35]    The provisions in the Cantrells' Employment Agreements surpass that threshold requirement.    Under *Fort Halifax* and under this court's precedent, the Cantrells' deferred-compensation benefits fall within the scope of ERISA.    I therefore respectfully dissent.

---

[34] *Id.*

[35] *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.2 (1992).